7659

WHITE v. HEWITT.

CONTRACTS—TENDER—MISREPRESENTATION—FRAUD.—A compromise settlement of an estate between conflicting claimants is here invalidated because of false or unfair concealments of the amount of the estate to one of the parties who was not in a position to know and was not on an equal footing as to knowledge of the situation, the representations having been made to and did induce the party to make the contract. The party receiving the money in such compromise is not required to tender it back before bringing action to set the settlement aside.

Before PURDY, J., Florence, ————. Modified.

Action by Theodosia White and David White against Minnie R. Hewitt and others. From order dismissing complaint, plaintiffs appeal.

*Mr. W. F. Clayton,* for appellant.

*Mr. J. W. Ragsdale,* contra.

August 19, 1910. The opinion of the Court was delivered by

MR. CHIEF JUSTICE JONES. This action was brought to set aside a compromise settlement of the estate of Henry White, deceased, upon the ground of concealment, misrep-

resentation and fraud, and for an accounting. The appeal is from a decree of Judge Purdy dismissing the complaint.

Henry White married plaintiff, Theodosia, on October 27, 1879, and about ten days after the marriage the plaintiff, David, their son, was born. Henry and Theodosia lived together at the home of Theodosia's father, William Hill, near Timmonsville, S. C., six months and then separated, although Henry continued to visit her as husband for several years. On May 12, 1889, the husband and wife entered into a written agreement to live apart, and, in consideration of fifty dollars, Theodosia agreed to make no further claim or demand upon her husband or his estate. At that time Henry was very poor. Theodosia and her son thereafter made no claim or complaint whatever against Henry White during his life, and lived about from place to place in toil and poverty, and at his death were living in Brookland, S. C., David being employed in a cotton mill there at seventy-five cents a day.

In July, 1889, Henry White married the defendant, Minnie R. Simpson, now Hewitt, and had four children by her, the defendants, Ann, Ralph, John and Henry.

Henry White died intestate on October 7, 1901, and left an estate consisting of two tracts of land in Florence county, one containing twenty-five acres and the other eighty acres, and personal property, including choses, which, according to the returns of the administrator, the defendant, Duncan McKenzie, realized $4,087.38, against which there were debts and charges amounting to $2,068.48.

In response to a telegram from his uncle, Jesse L. Hill, announcing the death of Henry White, the plaintiff, David, arrived at Timmonsville on the night of October 8, 1901, and with his uncle had an interview with Dr. J. A. Cole in reference to the claim of himself and mother to the estate, and all thought that it would be best to agree upon a compromise. Accordingly, on the next morning, Jesse L. Hill, representing the plaintiffs; Dr. J. A. Cole, representing

37—86

defendants, Minnie and her children; and Jeff McLendon, selected by both sides, met at Henry White's residence as a committee, or arbitrators, with a view to arrange a compromise, based upon a valuation of the estate. David White had proposed to divide the estate equally.

The committee valued the personal property, stock, etc., upon the farm at about $500.00, and the eighty-acre tract at $2,000.00, and recommended a settlement on that basis, and that plaintiffs execute deeds to the land and release claim to the personal property upon the receipt of $1,250. This included making a deed to George White for the twenty-five-acre tract. Both parties agreed to this, and, accordingly, on October 10, 1901, at Columbia, S. C., plaintiffs executed a deed to George White for the twenty-five-acre tract, and to Minnie R. and her children for the eighty-acre tract, and signed a receipt in full of all claim to the real and personal estate of Henry White.

The main ground upon which it is now sought to set aside this settlement is that there was fraudulent concealment and misrepresentation as to the property of the estate, by which plaintiffs were misled.

The testimony shows beyond all doubt that on the evening of the funeral of Henry White, and in anticipation of David's arrival, cotton and tobacco belonging to the estate, amounting to $703.00, were carried off with haste and sold or disposed of after dark in the name of others, and the money placed in the hands of defendant, McKenzie, and was used in paying the $1,250 to the plaintiffs. Baxter White testified that his wagon was used in moving the cotton at the request of defendant, Minnie. George White, who lived on the premises and was managing the farm for Henry White, testified that the cotton was hauled off from Henry White's on the day of the funeral, about 7 o'clock p. m.; that the cotton was sold in Frank Lee's name and the tobacco in Baxter White's name; that defendant, Minnie, knew he was hauling the cotton, and it was done with her

consent; that she expected David would come and claim it. Defendant, Minnie, testifies that the cotton and tobacco were not sold by her direction; that she had nothing to do with it; that George White had charge of the crop and place during the illness of Henry; that they had raised George; that she did not attempt to conceal anything from plaintiff; that she did not ask Baxter White for his wagon, and that she did not tell George White that she wanted the property moved, and did not tell him she was afraid David would get it. Nevertheless, the conclusion cannot be resisted that, if she did not directly cause the removal and disposition of the cotton and tobacco, she must have had reason to know of it and acquiesced in it. It was done in her interest by George White, then in charge of the premises, and she used the proceeds in making settlement with plaintiffs. Although this money was in the hands of McKenzie at the time of the compromise settlement, nothing was said about it, and plaintiffs were wholly ignorant of it.

Furthermore, Dr. Cole himself testified that he owed Henry White $400.00, and paid it to defendant, McKenzie, on the day of the funeral, to be used in the settlement. So that at the time of the valuation of the estate by the committee, or arbitrators, there was the sum of $1,103 belonging to the estate in the hands of one who afterwards became administrator and charged himself with these sums as collections, and was credited with the payment of the $1,250 paid to the plaintiffs in settlement.

The testimony shows that during the consideration by the committee Jesse L. Hill inquired if there was any money belonging to the estate, and that Dr. Cole answered that there was none. Jesse L. Hill and Jeff McLendon so testify. David White testified that Dr. Cole made a similar declaration to him the night before. We do not hesitate to treat Dr. Cole as representing the defendant, Minnie, in effecting the compromise settlement. He so professed by his acts; was so dealt with by the others; and defendant,

Minnie, testified that she "ratified what Dr. Cole did about the settlement." Dr. Cole testified that he made no misrepresentation as to the property of the estate. He doubtless did not know of the clandestine disposition of the cotton and tobacco the night before, and he may have considered that his payment to McKenzie, after the death of Henry White, could not be technically considered money left by Henry White; still the fact is, he knew at the time of the compromise negotiation, when inquiry was made as to money, that he himself had paid to Duncan McKenzie for the estate the sum of $400 in anticipation of some settlement, no doubt the compromise settlement he was largely instrumental in effecting. The representation to plaintiffs that there was no money was further shown by the testimony of Jesse L. Hill, who stated that when the proposition was made for Mrs. Hewitt to pay plaintiffs $1,250 something was said about not having money, and that George White said, "she would have to mortgage her property." At that time George had reason to know that the money realized from the sale of cotton and tobacco, which he had caused to be removed, was in the hands of McKenzie, and Dr. Cole knew that $400.00 had been placed there by himself. It further appears, by the testimony of Mrs. Hewitt and Duncan McKenzie, that on the day the deeds were executed Mrs. Hewitt sent to McKenzie, by the hand of George White, something over two hundred dollars for the purpose of paying the $1,250.

A compromise settlement may be invalidated by false representations as to a material matter which were made to induce and did induce the other party to make the contract, while ignorant of the truth and reasonably relying upon the representations.

See text and cases cited in 8 Cyc., 528, 529, 530. So, also, an unfair concealment of facts may constitute ground for relief against a compromise.

The principle is well stated in *Mills* v. *Lee* (Ky.), 17 Am. Dec., 125: "Courts of equity will hold the one party or the other responsible for the truth of the representations made in their communications relative to the contract, and if the facts be unfairly or untruly represented, whether innocently or designedly, the party to whom the representation is made shall not be injured by it. So, also, it holds a party contracting to abstain from fraud or deceit by concealment of facts which, in fair dealing, the one party has a right to expect to be disclosed, and which the other party is bound to disclose. It may be difficult at all times to discern the true line between that which a party may lawfully forbear to disclose and that which he cannot withhold without incurring the guilt of fraud or deceit. The circumstances not disclosed must always be compared with the object and the end in view by the contracting parties."

Here the end in view of the contracting parties was a compromise of their claims to the estate, based upon a valuation of the estate.

Jeff McLendon, accepted as arbitrator by both sides, testified: "We consulted over the matter and put on the appraisement. We came to terms as to valuation. There was nothing brought up except the eighty acres and the stock supposed to be plantation stock. We appraised it at $2,500. We then called in Baxter White and told him what we valued it at. Mr. Jesse Hill (one of the arbitrators) asked about money. The proposal was then made to the two parties, David and Minnie, and they accepted; that is, that Minnie was to give $1,250 to David and his mother, and she and her children were to take the property and pay laborers' bill and doctor's bill, and, I think, other indebtedness. I know nothing only of stock and plantation. We did not know of the property; it was, in a sense, a sort of pig in the bag. We settled as far as matters were brought to our attention. I regarded this as a settlement between the two families to avoid any litigation * * *. It was my opinion

that the settlement reached was a final settlement of Henry White's affairs between these parties. It was an estimate of the property that we had before us. I did not understand that any of the property was excluded or excepted. So far as we were concerned, it was a complete settlement of the estate. This settlement was desired, as I understood it, on account of the peculiar circumstances of each family. I consider that we put a fair valuation on the property. It was a compromise settlement on valuation. It was a compromise settlement in a nut shell on property in sight. We did not enumerate the property; we did not know what the debts were, except doctor's bill and labor bill. It was not predicated on Minnie's legal rights. To a certain extent it was predicated on the fact that both parties claimed it. We made the proposition to give or take. We proposed if there were any debts Minnie was to pay them. We did not know exactly what the personal property was. There were two estates consisting of real and personal property, and the proposition was made to David to give or take, and David said he would take $1,250 for self and mother. Minnie was to take estate and pay debts. Nothing was shown us by Minnie. She was not present until we went in and made the proposition. * * * Jesse L. Hill asked about money; don't think David was there then, and Minnie was not. There was reply that there was no money. Dr. Cole made the reply. It was put before the two; that is, David proposed before we went in to divide the estate equally."

The defendant claimant in possession had superior knowledge of the property of the estate and plaintiffs were entirely ignorant with respect thereto, except as to the matter brought into the appraisement. If plaintiffs had been told that they could have the entire estate upon payment of $1,250, and that there were $1,103 belonging to the estate in the hands of McKensie which they might use to make the payment, there would have been something like equality of knowledge and situation.

The parties were not upon an equal footing as to knowledge or ignorance of the situation, and the circumstances called for a disclosure of the money in the hands of McKensie. Concealment of this fact impeaches the settlement as unfair.

The Circuit Judge based his decree dismissing the complaint upon the ground that plaintiffs had a partial knowledge of the situation and the means at hand at any time by any sort of inquiring to ascertain the true situation, and the contract was the result of their own improvident conduct. The Court further stated: "They had knowledge at the time that part of the property of the deceased was being hauled off and disposed of and no question from their standpoint was made of that. So that it really appears that they were willing to give up the situation and all benefits accruing from it for the sum of $1,250, and having so elected they are bound by it."

We think this conclusion clearly against the testimony. The plaintiff, Theodosia, was never present and knew nothing. Plaintiff, David, who was acting for himself and mother, testified that he had no knowledge of the disposition of the property until a short time before the suit; that he relied upon the information received through Dr. Cole, acting as agent for Minnie White.

Jeff McLendon, who represented plaintiffs on the committee of arbitrators, testified: "The night before I saw George White have cotton at depot, weighing cotton. He had Henry's team, Baxter White's team and may be others." * * * "I knew that the cotton had been hauled. I knew that Henry had made a crop." "I tried to get some information. Dr. Cole said he knew about the estate. I asked about money. Dr. Cole said there was no money. I did not see cotton." If McLendon knew the cotton had been disposed of, the natural inquiry would be whether there was any money, and when assured there was none by the representative of Mrs. Hewitt, his suspicions, if any, would

naturally be lulled into a belief that the proceeds of the cotton had been rightfully used for the benefit of the estate.

There was no such negligence on the part of plaintiffs or their representatives in using available means of information as should prevent plaintiffs from impeaching the settlement for concealment of material facts.

No question was raised on circuit as to whether plaintiffs should have made tender back of the money received by them, before they could proceed to set aside the settlement. As plaintiffs received only what belonged to them without the settlement, they were not bound to tender it back. *Dupont* v. *DuBos*, 52 S. C., 244, 29 S. E., 665.

We hesitate, however, as to the extent of the relief which justice and equity demands under all the circumstances of the case.

With respect to the deed for the twenty-five-acre tract to the defendant, George White, we are disposed to sustain the settlement. The plaintiffs were fully informed that Henry White had bought that tract for George White, his half-brother, who lived with him and whom he partly raised, and had set it apart for him and intended to make him a deed, but neglected it until it was too late. It does not appear that there was any misrepresentation or concealment. This was a case of the compromise of a doubtful right fairly made between the parties. *Durham* v. *Wadlington*, 2 Strob. Eq., 258.

With respect to the deed to Mrs. Hewitt and the infant children, we are disposed to permit the settlement to stand conditionally, as hereinafter mentioned, because there was no misrepresentation or concealment with reference thereto, and plaintiffs with equal opportunity for information have voluntarily conveyed the same, and justice may be done to plaintiffs by compliance with the judgment of the Court hereafter rendered.

The same conclusion has been reached with respect to the personal property on the farm, stock, household furniture,

etc., which was appraised at $500 in the compromise settlement and subsequently appraised at $505 in the administration proceedings. All the testimony shows that this property was intended by both parties to be embraced in the settlement. We reach the same conclusion with respect to the choses in action, not including the account against Dr. Cole, paid at the time of the compromise, because the settlement was intended to be a full settlement of the estate and plaintiffs made no inquiry concerning the same, and there is no evidence that Mrs. Hewitt, or any representative, had any knowledge concerning the same. The choses were discovered by Duncan McKensie in the Bank of Timmonsville after his appointment as administrator.

This leaves the settlement impeached only because of the misrepresentation and concealment with reference to the $1,103 that were in the hands of McKenzie. The evidence leaves no room to doubt if this fund had been fairly brought into the settlement plaintiffs would not have executed the deeds and receipt upon the payment of one-half thereof in addition to the estimated one-half of the remainder of the estate, which has been received, and the settlement may be carried out justly towards plaintiffs by compelling further payment to them of $551.50, with interest from October 10, 1901.

Further accounting from Duncan McKensie, the administrator, is not deemed necessary or proper. He was discharged by the probate Court in 1903. While he permitted himself to become the custodian of funds of the estate before administration, there was no evidence that he was aware of the misrepresentation and concealment with respect to the fund in effecting the compromise.

The debts of the estate all appear to have been paid. He had no reason to doubt the validity of the receipt of plaintiffs acknowledging full setlement with respect to their claim to the estate, and in good faith he has disbursed the funds of the estate going into his hands.

From his accounts it appears that he not only paid the $1,250 in the compromise settlement, an additional $1,250 for indebtedness of Henry White, incurred in buying for Mrs. Hewitt a short time before his death a tract of land deeded to her by C. C. McEachern, and the further sum of $768.90 was paid to Mrs. Hewitt for herself and her children, the balance of the estate in the administrator's hands after debts and expenses. This settlement included the personal property on the farm appraised at $505.

The judgment of this Court is that the judgment of the Circuit Court dismissing the complaint be reversed, and that the defendant, Mrs. Minnie Hewitt, for herself and children, within sixty days from the filing of the remittitur herein, pay to the plaintiffs or their attorneys the sum of $551.50, with interest from October 10, 1901, and that upon compliance herewith the compromise settlement shall not be further disturbed, but upon failure to comply herewith, then that deed of the 80-acre tract and the settlement receipt with respect to the personal estate given by plaintiffs to Mrs. Hewitt and her children be set aside.